**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| RENEE J. WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:12-cv-01307-TWP-TAB |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff Renee J. Walker ("Mrs. Walker") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for Social Security Disability Insurance Benefits ("DIB") under Title XVI of the Social Security Act. For the reasons set forth below, the Court **AFFIRMS** the decision of the Commissioner.

**I. BACKGROUND**

**A.    Procedural History**

On November 4, 2009, Mrs. Walker filed an application for DIB, alleging a disability beginning November 25, 2008. Mrs. Walker's application was denied initially on March 9, 2010, and upon reconsideration on June 3, 2010. Thereafter, Mrs. Walker filed a request for a hearing, and a video hearing was held before Administrative Law Judge Ronald T. Jordan ("the ALJ") on May 26, 2011. Mrs. Smith was represented by counsel at the hearing. On July 6, 2011, the ALJ denied Mrs. Walker's application. On July 25, 2012, the Appeals Council denied Mrs. Walker's request for review of the ALJ's decision, making it the final decision of the

Commissioner for purposes of judicial review.  Mrs. Walker filed this civil action, pursuant to 42 U.S.C. § 405(g), for review of the ALJ's decision.

**B.      Factual and Medical Background**

At the time of the ALJ's decision, Mrs. Walker was 52 years old; the highest level of education she had completed was general education development.  Prior to the alleged onset date of her disability, Mrs. Walker had past relevant work experience as a customer service representative, general laborer, leasing agent, office manager, and receptionist. Mrs. Walker alleges the following impairments: fibromyalgia, diabetes, degenerative bone disease, chronic obstructive pulmonary disease ("COPD"), and asthma.

On March 1, 2006, Mrs. Walker was involved in a motorcycle accident.  She broke her ribs and wrist, and injured her neck and back.  Mrs. Walker reported that shortly afterward, approximately March 3, 2006, she began experiencing debilitating headaches that could last from 12 hours up to three days.  She reported that the headaches often caused her to be incapacitated for a period of two to four days per week and that the pain varied depending on the barometric pressure and weather.  Mrs. Walker typically treated the headaches with Tylenol Arthritis, 600 milligrams of Ibuprofen, Tramadol, Flexeril, or by lying on an ice pack.   She also stated when pain from the headaches is combined with her pain from the fibromyalgia, she is unable to do anything including shopping, cleaning, and sitting.  She has to lie in the bed for days at a time. Mrs. Walker received a computed tomography ("CT") scan of her head on May 21, 2007.  The CT scan showed no abnormalities, lesions, masses, hemorrhages, or other acute findings.

Mrs. Walker has been seen by primary care physician, Dr. James Brooks Bolton ("Dr. Bolton"), for a variety of medical problems including metabolic syndrome with hypertension, diabetes, obesity and hyperlipidemia, asthma, and tobacco abuse.  On February 15, 2008, Mrs.

Walker went to the emergency room at St. Francis Hospital because she injured her right knee when she fell partly out of her truck. After an x-ray which showed no fracture or dislocation, she was treated conservatively with a knee brace and anti-inflammatories. She was also given crutches, to use as needed. On February 27 and March 20, 2008, Mrs. Walker followed up with Dr. Bolton regarding the pain in her right knee. Dr. Bolton noted slight swelling and possible soft tissue damage so he ordered a magnetic resonance imaging ("MRI") scan but due to insurance issues, Mrs. Walker was not able to obtain an MRI at that time. Mrs. Walker went in for a follow up appointment with Dr. Bolton on April 23, 2008; in addition to pain in her right knee, she complained of right ear pain, cough, and sore throat. Dr. Bolton noted that Mrs. Walker had no chest pain, fever, nausea, or vomiting and diagnosed her with an upper respiratory infection ("URI") and again ordered an MRI.

On May 8, 2008, Dr. Eric Monesmith ("Dr. Monesmith") at Ortho Indy South performed an examination and MRI on Mrs. Walker's right knee. Mrs. Walker informed Dr. Monesmith that she had swelling and moderate pain in the knee, and she was only able to walk for about five to ten blocks because walking for long periods of time aggravated her knee. Dr. Monesmith determined that Mrs. Walker had some pain from compressions to the patella and mild effusion in her knee, but the knee was stable otherwise. Dr. Monesmith suggested there might be a meniscus tear and recommended weight loss, quadriceps strengthening exercises, range of motion exercises, and cold application to treat the injury. On May 19, 2008, Mrs. Walker returned to Dr. Monesmith to review the results of the MRI. Dr. Monesmith determined that Mrs. Walker had not sustained a contusion but suggested possible synovitis plica type syndrome. He treated the injury conservatively with a cortisone injection and anti-inflammatory medication. He again advised cold application, quadriceps exercises, and physical therapy for treatment.

Mrs. Walker returned to Dr. Bolton for treatment on August 20, September 2, and October 2, 2008.  Mrs. Walker did not complain of headaches, dizziness, chest pain, nausea, vomiting or diarrhea during any of her appointments.  On August 20, 2008, Mrs. Walker complained of an ear ache, sore throat, congestion, cough, and night wheezing.  Dr. Bolton performed a chest exam and found her airways clear and heard no wheezing.  Dr. Bolton determined she had a URI which he noted had been going on for a long time.  Dr. Bolton also noted that the URI was not an asthma exacerbation and recommended that Mrs. Walker continue taking Advair for her asthma.  During the office visit on September 2, 2008, Mrs. Walker complained of feeling bad all over with a bad cold.  She also complained that her eyes were matted in the mornings and she noticed drainage from both eyes.  Dr. Bolton diagnosed her with conjunctivitis and ordered lab work because of her URI and flu like symptoms. When Mrs. Walker returned to Dr. Bolton on October 2, 2008, she complained that she was still having trouble with her eyes but her cold was better and her breathing was fine.  Dr. Bolton diagnosed her with allergic conjunctivitis.  He also indicated in his report that Mrs. Walker is exceedingly non-compliant.  Mrs. Walker refused treatment for hyperlipidemia and hypertension.  She did not get the lab work done that he requested during her visit on September 2, 2008.  She also refused Glucophage and an ACE inhibitor for diabetes treatment during her appointment on August 20, 2008.  When Dr. Bolton recommended that she quit smoking, she informed him that she had no intentions to do so at that time.

Mrs. Walker has also visited the St. Francis Hospital Emergency Room for medical treatment.  Each time Mrs. Walker visited the emergency room she was ambulatory.  On October 31, 2008, Mrs. Walker went to the emergency room complaining of elbow pain.  Doctors noted some redness and swelling and she was given medication for the pain.  On December 28, 2008,

Mrs. Walker went to the emergency room complaining of chest pain and shortness of breath. After a chest x-ray and examination doctors determined that her chest was normal and that her symptoms were caused by an asthma exacerbation. On October, 15, 2009, Mrs. Walker returned to the emergency room complaining of difficulty breathing, body ache, and shortness of breath. An x-ray of her chest revealed mild dextro scoliosis of the thoracic spine and minor atelectasis versus new linear scar in lateral mid lung field since December 28, 2008. Mrs. Walker was given a breathing treatment which she stated helped a lot.

On January 26, 2010, Mrs. Walker received a consultative examination by doctors at Greenwood Pediatrics and Internal Medicine. During the examination, Mrs. Walker reported a medical history of diabetes mellitus, COPD, degenerative disk disease, fibromyalgia, and constant pain since a motorcycle accident in 2006. She complained of not sleeping well, fatigue, night sweats, daily headaches, severe generalized arthralgia and severe myalgia, depression, and anxiety. The physical examination report stated that Mrs. Walker came in ambulatory and without the use of any assistive device. Mrs. Walker walked slowly and appeared to be in pain. She was able to get on the examination table and showed no signs of dyspnea or fatigue at rest. She had full range of motion in her arms and legs, though she seemed to be in pain. The general impression of the doctors was fibromyalgia.

On March 8, 2010, a Physical Residual Function Capacity Assessment ("RFC") was performed by State Consultative Examiner, Dr. B. Whitley ("Dr. Whitley"). Dr. Whitley determined that Mrs. Walker could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. She could sit and stand with normal breaks for 6 hours of a regular 8 hour work day. Dr. Whitley also determined that Mrs. Walker had no visual, communicative, or environmental limitations. She further had no limitations pushing or pulling objects except those

listed for lift and/or carry. Dr. Whitley also determined that Mrs. Walker's statements regarding the intensity of her symptoms and their impact on her ability to function were only partially credible because they were inconsistent with the medical evidence. Dr. Whitley's determinations were affirmed by Dr. J.V. Corcoran on May 3, 2010, after he reviewed the record.

Mrs. Walker underwent a consultative psychological examination by State consultative examiner, Dr. Michael O'Brien ("Dr. O'Brien"). Mrs. Walker did not submit any prior history of mental health treatment.[1] Mrs. Walker informed Dr. O'Brien that she regularly does household chores including laundry, cooking meals, dishes, dusting, cleaning the bathroom, and grocery shopping. Mrs. Walker also reported that she worked for Federal Express until 2009, when a company restructuring caused all employees with extended medical leave to be terminated. During her tenure at Federal Express, she got along well with her coworkers and only had problems with one supervisor. Mrs. Walker also informed Dr. O'Brien that she gets panicked in crowds of 100 or more people, except when she is at church or at the grocery store because she has some familiarity with the people there. She reported having panic attacks two to three times weekly. Regarding depression, Mrs. Walker reported that she has ongoing sadness and difficulty with concentration, but she does not have suicidal or homicidal ideations. She also indicated that she has trouble sleeping. Dr. O'Brien noted that Mrs. Walker reported that on average she gets about 6 to 7 hours of sleep daily. Mrs. Walker spent hours playing games on Facebook to help relieve her stress. Additionally, Mrs. Walker stated that she has trouble with her memory which she has been told is caused by her fibromyalgia but she thought it was more closely related to Alzheimer's disease because her father and aunt both had the disease.

---

[1] The record reflects a psychiatric review on December 11, 2009, by Dr. Randall Horton. Dkt. 12-7 at 49-62. Dr. Horton determined that there were no medically determinable impairments but there is no psychiatric examination associated with the review. There is also no evidence in the record that the ALJ gave weight to this report.

6

Dr. O'Brien diagnosed Mrs. Walker with Panic Disorder without Agoraphobia and recurrent, moderate, Major Depression Disorder. Dr. O'Brien determined that Mrs. Walker could understand, remember, and carry out simple tasks, based on her self-reporting of regularly doing household chores, running errands, and spending hours on Facebook. He also determined that Mrs. Walker did not have difficulty with attention and distractibility, and that she was calm and demonstrated knowledge and facility with common social graces. Additionally, Dr. O'Brien assigned Mrs. Walker a Global Assessment of Functioning score of 55.

Dr. O'Brien's assessment was reviewed by Dr. Joseph Pressner ("Dr. Pressner") on June 3, 2010. Dr. Pressner determined that Mrs. Walker had mild degrees of limitation in the areas of concentration, persistence, and pace; difficulty maintaining social functioning; and restrictions of daily living. He also determined there were no episodes of decompensation. Dr. Pressner noted that Dr. O'Brien's diagnosis did not identify any severe deficits and gave weight to Dr. O'Brien's diagnosis because it was consistent with other evidence. Dr. Pressner ultimately concluded that Mrs. Walker's condition was not severely limiting.

On September 7, 2010, Mrs. Walker began to see Dr. K. Kerner ("Dr. Kerner") as a new patient. She presented to Dr. Kerner with a history of asthma, diabetes, depression, and anxiety. She smoked a pack of cigarettes a day. Mrs. Walker was sleeping poorly at night and had pain from fibromyalgia. She reported sleeping from 6:00 a.m. until 1:00 p.m. She also reported that she was out of pain medication and had not been using her inhalers or taking medication on a regular basis. Dr. Kerner had Mrs. Walker restart Actos and Glipizide for diabetes, restart Lexapro for depression, anxiety, and fibromyalgia pain, and continue Xanax but discontinue Celexa for anxiety relief. Mrs. Walker was also instructed to follow up with Dr. Kerner in six weeks.

On October 19, 2010, Mrs. Walker presented to Dr. Kerner complaining of right shoulder pain radiating to her bicep causing her to take more Tramadol and Flexeril. She was also using her sister's Lantus insulin to treat her diabetes. Additionally, Mrs. Walker reported that she was having more anxiety attacks which she attributed to the Lexapro but she stated the Lexapro was helping with her depression and crying. Dr. Kerner prescribed medication for Mrs. Walker's shoulder pain, changed her insulin and continued Lexapro for the depression and fibromyalgia. Mrs. Walker returned to Dr. Kerner on November 1, 2010, complaining of a stabbing pain in her right arms, noting the pain was different than the "aching" fibromyalgia-type pain. On December 2, 2010, Mrs. Walker related to Dr. Kerner that her blood sugars were elevated at night. She also relayed that her depression was improved with Lexapro but she still felt some depression. Lyrica was helping with the pain a little but she still needed to take Tylenol and the combination made her very dopey. On January 3, 2011, Mrs. Walker reported to Dr. Kerner that she was not able to raise her left arm. During a follow up visit on April 4, 2011, Mrs. Walker complained that she had pain and decreased mobility in her left shoulder for four months. She stated she woke up one day and the pain was there, she took Tramadol and Flexeril for the pain but neither resolved the pain. Dr. Kerner recommended physical therapy to treat Mrs. Walker's left shoulder pain. Additional facts will be discussed as needed.

## II. DISABILITY AND STANDARD OF REVIEW

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous

work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. §416.920(a)(4)(i). At step two, if the claimant does not have "severe" impairment (i.e. one that significantly limits his ability to perform basic work activities) that meets the durational requirement, she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). In order to determine steps four and five, the ALJ must determine the claimant's RFC, which is the "maximum that a claimant can still do despite her mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 4040.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform her past work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 416.920(a)(4)(v). When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step. *Zuraawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. THE ALJ'S DECISION

As an initial matter, the ALJ determined that Mrs. Walker met the insured status requirement of the Act through March 31, 2014. At step one, the ALJ determined that Mrs. Walker had not engaged in substantial gainful activity since November 25, 2008, her alleged onset date. At step two, the ALJ determined Mrs. Walker had the following severe impairments which impose a significant limitation on her ability to perform basic work activities: obesity, metabolic syndrome, asthma, tobacco abuse, myofacial pain diagnosed as fibromyalgia without specific clinical findings, depression, and anxiety. The ALJ determined at step three that Mrs. Walker did not have an impairment or combination of impairments that meet or medically equal one of the listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Prior to a step four

analysis, the ALJ performed the required RFC analysis. The ALJ determined that Mrs. Walker had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) including lifting, carrying, pushing, and pulling 20 pounds occasionally and 10 pounds frequently; standing and walking a total of about six hours in an eight hour workday, with normal breaks; occasional balancing, stooping, kneeling, crouching, and crawling; occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds, and no exposure to hazards such as unprotected heights or unguarded, dangerous, moving machinery. Additionally, the ALJ determined that Mrs. Walker was limited to simple, repetitive work tasks requiring minimal independent judgment or analysis and static, predictable, work goals from day to day. At step four, the ALJ determined that Mrs. Walker could not perform any past relevant work. At step five, the ALJ determined that based on Mrs. Walker's age, education, work experience, and RFC she could perform work and accordingly was not disabled from November 25, 2008 until July 6, 2011.

## IV. DISCUSSION

Mrs. Walker raises three issues in her appeal. First, she argues that the ALJ's decision that she was not disabled due fibromyalgia and chronic pain was not supported by substantial evidence. Next, she argues the ALJ's credibility decision is patently erroneous because it is contrary to Social Security Regulation 96-7p ("SSR 96-7p"). Finally, she argues that the ALJ's step five determination is not supported by substantial evidence.

**A.   The ALJ's decision that Mrs. Walker was not disabled due to fibromyalgia and chronic pain was supported by substantial evidence.**

First, Mrs. Walker argues that the diagnosis of fibromyalgia automatically renders her disabled. Respectfully, the Court must disagree. The Seventh Circuit has held "it is not enough

to show that she received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling." She "has to provide sufficient evidence of actual disability before [the onset date]." *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). The ALJ would have to determine if Mrs. Walker was in the minority of those patients who suffer from fibromyalgia and become totally disabled from working. *Id.* He did not. The ALJ found instead that Mrs. Walker failed to provide sufficient evidence of actual disability before November 25, 2008.

Next, Mrs. Walker contends the ALJ erroneously based his denial decision on his own layperson expertise, failing to give weight to her treating physician's opinion and selectively giving consideration to her medical record. The Court cannot agree. Under the treating source rule, 20 C.F.R. § 404.1527(d)(2), the ALJ should give controlling weight to the decision of the treating physician when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (internal quotations removed). "An ALJ must offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Here, the ALJ gave substantial weight to Drs. O'Brien and Whitley because there was no opinion given by any of Mrs. Walker's treating physicians stating that she was totally disabled and unable to work because of her impairments. The ALJ accepted the diagnoses of Mrs. Walker's treating physicians and utilized the medical evidence to reach his final conclusion. The Court finds that the ALJ did not err when he gave substantial weight to the State Consultative Examiners because there were no inconsistencies between the treating physicians' and the State examiners' opinions.

Additionally, Mrs. Walker argues that the ALJ ignored evidence in the record because he did not mention it in his decision. However, the ALJ does not need to address every piece of evidence in his decision; he only needs to build a logical bridge from the evidence to his conclusion. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). Throughout his decision, the ALJ relies on medical evidence submitted by Mrs. Walker to reach his conclusion. One example is the ALJ's lengthy recitation of Mrs. Walker's medical history when determining that Mrs. Walker had severe impairments which impose limitations on her ability to work. Dkt. 12-2 at 14-17. Mrs. Walker argues that the ALJ ignored the fact that she had headaches, dizziness, and complained of arthralgia and myalgia, but, this is untrue. The ALJ specifically noted that during the consultative examination Mrs. Walker complained of having the symptoms listed above and factored those symptoms into his decision when determining that Mrs. Walker had substantial impairments. Dkt.12-2 at 15-16. Mrs. Walker's claim that the ALJ ignored evidence is unfounded.

The Court finds that the ALJ's decision was supported with substantial evidence and there was no error when the ALJ determined that Mrs. Walker was not disabled due to fibromyalgia and chronic pain.

**B.     The ALJ's credibility determination was not patently wrong.**

Mrs. Walker argues that the ALJ's credibility determination is contrary to the evidence and Social Security Ruling 96-7p. SSR 96-7p, states:

> When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects . . . the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case

13

> record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

*Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P (S.S.A. July 2, 1996).

Additionally, the ALJ must evaluate credibility in light of (i) daily activities, (ii) the location, frequency, and duration of pain, (iii) precipitating and aggravating factors, (iv) the effects of medication, (v) treatment, (vi) other measures used to relieve the pain, and (vii) other factors concerning functional limitations. 20 C.F.R. § 404.1529(c)(3). Credibility is largely a factual determination, and because the ALJ is in the best position to observe witnesses, the court will not usually upset credibility determinations on appeal so long as some support in the record is found and the decision is not patently wrong. *Herron*, 19 F.3d at 335. Furthermore, the use of boilerplate language will not "undermine or discredit" an ALJ's conclusion if he identifies evidence in the record to justify his credibility determination. *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013).

The ALJ's credibility determination was not patently wrong. The ALJ determined Mrs. Walker's medically determinable impairment could reasonably be expected to cause the alleged symptoms. However, the ALJ found Mrs. Walker's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible because they were inconsistent with the record. Dkt. 12-2 at 21. Mrs. Walker argues that the ALJ's credibility determination was wrong because he used boilerplate language. The ALJ's use of boilerplate language does not automatically make the decision reversible. Consistent with the Seventh Circuit's decision in *Pepper,* the ALJ was able to point to specific evidence in the record to support his decision, even though he used boilerplate language. 712 F.3d at 367-68. The ALJ

determined that the clinical findings and test results were inconsistent with the alleged disabling symptoms. Dkt. 12-2 at 21. He cites to evidence that the medical imaging studies taken for complaints of pain were all negative. Dkt. 12-2 at 21. He also noted that Mrs. Walker never needed emergency medical intervention for headaches or dizziness and that the record reflects little evidence of fibromyalgia pain or flares. Dkt. 12-2 at 21. He also cites to Mrs. Walker's report to Dr. O'Brien that she regularly does laundry, dishes, and dusting, grocery shops, cooks meals, and runs errands. Dkt. 12-2 at 21.

It is clear that the ALJ based his decision on the totality of the record. Accordingly, the Court finds the ALJ provided adequate support for his conclusions; therefore, his credibility determination is not patently wrong.

**C.     The ALJ's step five determination that Mrs. Walker could perform some jobs was supported by substantial evidence.**

Mrs. Walker argues that the ALJ's work limitations of unskilled work involving only simple, routine and repetitive tasks did not address the impact of her mental limitations because the ALJ failed to account for her deficiencies in concentration, persistence, and pace. The ALJ gave great weight to Dr. O'Brien's opinion and found Mrs. Walker to have moderate difficulties with concentration, persistence, and pace. Dkt. 12-2 at 19. Dr. O'Brien determined that Mrs. Walker was best suited for simple tasks and that she would be able to adapt to routine changes in the workplace without difficulty. Dkt. 12-2 at 19. The ALJ also based his decision on his observation of Mrs. Walker during the hearing and Mrs. Walker's testimony. Dkt. 12-2 at 19.

Mrs. Walker also argues that the ALJ's decision must be remanded because it omits consideration of the vocational expert's ("VE") testimony at hearing that given all of her impairments, she could perform no jobs. During the hearing, the ALJ presented two hypotheticals to the VE. First, he asked about the availability of jobs using the RFC that Dr.

Whitley listed in his report, while factoring in Mrs. Walker's deficiencies in concentration, specifically that she would be limited to work that would require minimal independent judgment or analysis and static work goals. Dkt. 12-2 at 48-49. Next, he asked about the availability of jobs if Mrs. Walker was on the sedentary exertion level and had moderate concentration problems. Dkt. 12-2 at 50. The VE stated that Mrs. Walker would not be able to return to any past work in either scenario but under the first hypothetical there were 5,554 available positions in Indiana's economy that she could perform and 344,000 in the national economy. Under the second hypothetical, the VE reported there were 3,548 positions available in Indiana and 198,000 positions available in the national economy that Mrs. Walker would be able to perform with her limitations. Dkt. 12-2 at 49-50. Mrs. Walker's attorney also presented a hypothetical to the VE based on her impairments as she perceived them, to which the VE replied there would be no jobs that she could perform. Dkt. 12-2 at 53.

"[T]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). The ALJ did not find Mrs. Walker's statements concerning the intensity, persistence, and limiting effects of the symptoms credible because they were inconsistent with the record. Dkt. 12-2 at 21. In its earlier discussion, the Court determined that the ALJ's credibility decision was not patently wrong. The ALJ's hypotheticals included the RFC that this Court has found was supported by substantial evidence. Under *O'Conner-Spinner v. Astrue*, 627 F.3d 614, 619-21 (7th Cir. 2010), as long as the ALJ's RFC finding is supported by substantial evidence, and there is no inconsistency between the RFC and the hypothetical question, remand is not mandated. *See Packham v. Astrue*, 762 F. Supp. 2d 1094, 1105 (N.D. Ill. 2011). Accordingly, the Court finds that the ALJ's hypothetical is consistent with the RFC and is therefore not erroneous.

16

## V.  CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**.

**SO ORDERED.**

Date: 09/23/2013

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov